FILED
2012 Sep-26  PM 02:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| MARTHA D. COOK, | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| v. | } | **Case No.: 1:11-CV-1810-RDP** |
| | } | |
| MICHAEL J. ASTRUE, | } | |
| COMMISSIONER OF | } | |
| SOCIAL SECURITY, | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OF DECISION

Plaintiff Martha D. Cook brings this action pursuant to Sections 205(g) and 1631(c) of the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her applications for a period of disability and disability insurance benefits ("DIB") under Title II of the Act, and Supplemental Security Income ("SSI") benefits under Title XVI of the act. *See also*, 42 U.S.C. §§ 405(g) and 1383(c). Based upon the court's review of the record and the briefs submitted by the parties, the court finds that the decision of the Commissioner is due to be remanded for further consideration.

## I.    Proceedings Below

This action arises from Plaintiff's applications for Title II Social Security disability, DIB, and Title XVI SSI, both dated March 22, 2007, alleging disability beginning on March 20, 2007. (R. 15, 104, 106). These applications were denied by the Social Security Administration on July 24, 2007. (R. 52, 57). On August 10, 2007, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (R. 66). Her request was granted and a hearing was held in

Anniston, Alabama on September 8, 2009 by video teleconference with the ALJ presiding from Memphis, Tennessee.  (R. 38-49, 75).

In his decision, dated October 15, 2009, the ALJ determined that Plaintiff met the insured status requirements of the Act through December 31, 2009, and has not engaged in substantial gainful activity since her alleged onset date of disability of March 20, 2007. (R. 15).  The ALJ further determined that Plaintiff was precluded from performing past relevant work. (R. 23). However, based on the testimony of the Vocational Expert ("VE"), the ALJ determined that Plaintiff is not disabled and is capable of adjusting to other work that exists in significant numbers in the national economy.  (R. 23-24).  On April 26, 2011, the Appeals Council denied Plaintiff's request for review of the ALJ's decision (R. 1), making that decision the final decision of the Commissioner, and therefore, a proper subject of this court's review.  42 U.S.C. §§ 405(g), 1383(c).

At the time of the hearing, Plaintiff appeared in person along with counsel and William Crunk, a Vocational Expert.  Plaintiff was 38 years old and had completed high school and two years of college before withdrawing due to health reasons.  (R. 40-41).  Plaintiff's work experience includes unskilled labor as a restaurant server/dishwasher, certified nurses assistant, material handler in a textile mill, winder operator at a carpet factory, housekeeper for a hospital, and health service technician at another hospital. (R. 41, 45, 121).  Plaintiff last worked in July 2006, eight months before the alleged onset of her disability.  (R. 121, 235).

When Plaintiff first applied for disability, she alleged she suffers from multiple limitations from her impairments, both physical and mental.  (*See* R. 41-45, 130-34, 141-42). Physically, Plaintiff states that, due to a stroke and a left ventricular aneurism from 2000, she suffers limitations that include: memory loss (displacia), weakness in her left side, chest pain,

shortness of breath, and general muscle weakness.  (R. 44-45, 170-75).  Plaintiff claims these physical conditions prevent her from lifting heavy objects or standing for long periods of time. (R. 42-43).  She also claims that these limitations cause fatigue, weakness, and numbness; and as a consequence, her husband has to help her get up in the morning, bathe, dress, and generally take care of her. (R. 42-45).

Plaintiff also alleges her mental limitations are exacerbated by her deteriorating physical impairments.  (R. 132, 187).  Plaintiff claims her mental impairments stem from traumatic experiences in her childhood, including being raped by her father. (R. 236, 290).  Allegedly, her symptoms have progressively worsened to a point where she does not like being around people or crowds.  (R. 42, 132, 187, 237, 270).  Due to her combined physical and mental impairments, Plaintiff states she must lay down between five and six times each day during the hours of 8:00 a.m. and 5:00 p.m., for thirty minutes to one hour intervals.  (R. 43).

Plaintiff's claims on appeal contest the ALJ's decision, but do not challenge the ALJ's evaluation of her physical impairments.  (*See* Pl. Mem. 1-18; R. 95-98, 160-62).  Instead, Plaintiff limits her arguments to the ALJ's assessment of her mental impairments and the limitations they impose on her ability to work.  (*Id*.).

### a.      History Prior to Filing for Disability

The earliest indications of Plaintiff's physical impairments appear to have occurred on February 23, 2000 when, after being admitted to an emergency room in Gordon County for chest pains, Plaintiff was transferred to Columbia Redmond Regional Medical Center ("CRRMC"). (R. 173).  Plaintiff was found to have a left ventricular aneurysm, as well as onset left bundle branch block.  (*Id*.).  On January 16, 2002 and October 12, 2004,  Plaintiff's heart condition was tested at CRRMC by echocardiogram and cardiac catheterization, respectively.  (R. 166-69).

The tests confirmed continued heart trouble: "coronary anomalous disease and/or Atherosclerotic disease" (R. 169) and "final impression - ventricular aneurysm" (R. 167). At some point Plaintiff was prescribed several medications: Walfarin, Demedex, Prevacid, Isosorbide, Klor-Con, and Metropolol. (*See* R. 182).

Available medical records show Plaintiff received mental health treatment from Dr. Quresh Z. Bandukwala between March and December 2005. (R. 177-82, 236). Dr. Bandukwala is an adult psychiatrist in Rome, Georgia that saw Plaintiff at least four to five times. (*See* R. 177-82). While his notes are largely illegible, printed forms reveal Plaintiff's diagnosis to be adjustment disorder with depressed mood, as well as post traumatic stress disorder. (*See* R. 176-78). Plaintiff was prescribed Zoloft and Klonopin to take in addition to a list of other medications she had already been taking. (*See* R. 182).

During the subsequent months, Plaintiff was seen by her primary care physician, Dr. J. Brent Box, in Georgia for periodic treatment for her heart problems. (*See* R. 184-96, 169-70, 173, 201). From January to May 2006, Plaintiff was tested at least five times to determine her International Normalized Ratio ("INR") (*i.e.*, a test for blood clotting). (*See* R. 185-96). Reports show Plaintiff was being prescribed a blood thinner. (R. 186, 188, 192-96). Dr. Box noted that "[Plaintiff] does have a lot of problems with pain which gets worse when she gets depressed" when he concluded her diagnostic impression to be severe depression. (R. 187). For this condition, Dr. Box prescribed Prozac and Elavil for Plaintiff to take in addition to the Wellbutrin she was already taking. (R. 188). The effect was a later diagnostic impression of improved depression. (R. 186). There is no evidence in the record to indicate Plaintiff was treated by Dr. Box after May 2006. (*See* R. 233).

In the months after being treated by Dr. Box, Plaintiff returned to Oxford, Alabama.  On March 16, 2007 Plaintiff was admitted to the emergency room at Northeast Alabama Regional Medical Center ("NARMC"), where she stayed for six days receiving treatment for chest pains and shortness of breath related to her heart conditions.  (R. 200-01, 215).  She was seen by Dr. Mohammad Ismail, attending physician, who ordered an echocardiogram and stress test.  (R. 202).  Dr. Ismail noted that Plaintiff had not been taking her heart medications, Lopressor and Altace, "because of financial reasons," but continued her on her previous medications. (R. 202-03).  By March 22, 2006, Plaintiff's INR had stabilized, her medications had been adjusted, and she was diagnosed with severe depression (among other ailments) before being discharged.  (R. 215).  In a follow-up two weeks later, Plaintiff showed an improved blood pressure of 118/84. (R. 221).

### b.    Proceedings After Filing for Disability

The same day Plaintiff was discharged from NARMC, she filed for disability.  (*See* R. 10, 104).  Plaintiff visited Dr. Ismail once more on May 14, 2007, where his notes indicate a diagnostic impression of depression and that she was willing to do group therapy.  (R. 228).  He also indicated Plaintiff was disabled.  (*Id.*).  After receipt of her applications for DIB and SSI on March 22, 2007, the Disability Determination Service ("DDS") referred Plaintiff to Dr. Storjohann to receive a psychological evaluation.  (R. 234-39).  Plaintiff's psychological consultative examination was conducted on July 16, 2007.  (*Id.*).

At the time of the evaluation, Dr. Storjohann examined Plaintiff and had reviewed her medical files on record.  (R. 235).  At that time, Plaintiff reported several things to Dr. Storjohann, including: she was raped by her father as a child; she has been suffering from depression and anxiety "for as long as she can recall;" and her mental health difficulties have

only become worse as her physical health has deteriorated.  (R. 236).  She also reported that she had been out of work since July 2006, and has had problems accessing health care services.  (R. 235, 238).  Dr. Storjohann gave Plaintiff a Global Assessment of Functioning ("GAF") score of 42 and diagnosed her with post traumatic stress disorder, chronic, severe; major depression, recurrent, severe, without psychotic features, chronic; generalized anxiety disorder; and social phobia, generalized.  (R. 238).

Dr. Storjohann's detailed prognosis of Plaintiff was noted as "extremely poor" for the next six to twelve months based on her physical and mental impairments, and recommended intensive mental health treatment.  (R. 239).  He concluded that Plaintiff had "moderate to marked deficits in her ability to understand, carry out, and remember instructions in a work setting." (*Id.*) As for her ability to function in a working environment, Dr. Storjohann found Plaintiff had "marked to extreme deficits in her ability to respond appropriately to supervision, coworkers, and work pressures in a work setting." (*Id.*).

On July 23, 2007, Dr. Dale Leonard, a non-examining psychologist, completed a residual functional capacity ("RFC") assessment for Plaintiff based on all of her medical records.  (*See* R. 250-68).  Dr. Leonard first completed a psychiatric review technique form on Plaintiff, noting relevant medical records, including those from: Dr. Storjohann, NARMC, Dr. Ismail, Anniston Quality, and Dr. Bandukwala.  (*See* R. 250-63).  Dr. Leonard then completed Plaintiff's RFC assessment concluding that while she could understand and perform simple tasks, "[c]oncentration for detailed tasks would be limited at times by emotional factors." (*See* R. 264-68).  He further found Plaintiff "able to complete an 8-hour workday" with some limitations: (1) she should receive all customary breaks; (2) have a flexible daily schedule in a well-spaced work setting; (3) interactions should be casual and non-intense; and (4) supervision was to be

supportive and non-confrontational. (*Id*.). The DDS denied Plaintiff's claims the next day on July 24, 2007. (R. 52-57).

After Plaintiff's claims were denied, she again saw Dr. Ismail on August 30, 2007 where he assessed Plaintiff's functional capacity and gave her a poor prognosis to work again. (R. 270-71). While his prognosis was largely based on objective tests of her physical impairments, he advised Plaintiff to seek mental health treatment in a partial hospitalization program and to apply for disability. (R. 271). Records reveal Plaintiff did not see Dr. Ismail again until almost two years later. (*See* R. 283-85).

Plaintiff was admitted to NARMC again on June 3, 2009 due to chest pain. (R. 278). Over the three days she was admitted to NARMC, Plaintiff was seen by Dr. Ismail who ordered tests and lab work related to her heart condition. (*See* R. 278, 284). Dr. Randolph also conducted a psychiatric consultation of Plaintiff prompted by her mood complaints. (R. 290-91). His diagnostic impression was that Plaintiff was suffering from: major depression, recurrent psychotic features; post traumatic stress disorder; and borderline personality. (R. 290). Plaintiff was assigned a GAF score of 38, and Dr. Randolph recommended an increase in her medication as well as a "followup through mental health center for psychotherapy." (R. 290-91). Plaintiff was discharged on June 6, 2009, and the ALJ hearing was conducted on September 8, 2009. (R. 38, 278).

## II.    ALJ Decision

Disability under the Act is determined under a five-step analysis. 20 C.F.R. § 404.1520(a). First, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(b). "Substantial work activity" is work activity that involves performing significant physical or mental activities. 20 C.F.R. § 404.1572(a). "Gainful

work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. Second, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that is "severe." 20 C.F.R. §§ 404.1520(c), 416.920(c). Absent such impairment, the claimant may not claim disability. Third, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526. If such criteria are met, the claimant is declared disabled.

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. Before proceeding to steps four and five, the ALJ must first determine the claimant's RFC, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. § 404.1520(e). In the fourth step, the ALJ determines whether the claimant has the RFC to perform past relevant work. 20 C.F.R. 404.1520(f). If the claimant is determined to be capable of performing past relevant work, then she is deemed not disabled. If the ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the fifth and final step.

In the final step of the analysis, the ALJ must determine whether the claimant is able to perform any other work commensurate with her RFC, age, education, and work experience. 20 C.F.R. § 404.1520(g). Here, the burden of proof shifts from the claimant to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her RFC, age, education, and work experience. 20 C.F.R. §§ 404.1512(g), 404.1560(c).

In this case, the ALJ determined that Plaintiff: (1) has not engaged in substantial gainful activity since March 20, 2007, the onset of her alleged disability; (2) does have severe medically

determinable impairments—namely, lupus, osteoarthritis, status post cardiac aneurysm, post-traumatic stress disorder, major depressive disorder and generalized anxiety disorder; but (3) does not have an impairment or combination of impairments as listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 17, 19). After consideration of the record, the ALJ found that Plaintiff has the physical RFC to lift ten pounds, stand and/or walk two hours in an eight hour workday and sit six hours in an eight hour workday. (R. 21). Mentally, the ALJ concluded Plaintiff had the RFC to understand, remember and carry out simple job instructions; she is able to sustain concentration, persistence and pace for two hours out of the eight hour workday; and she is capable of occasional interaction with supervisors and coworkers, though she should not be required to interact with the general public. (*Id.*). Based on the testimony of the VE, the ALJ found that Plaintiff was unable to perform any past relevant work (20 C.F.R. §§ 404.1565, 416.965), which was all unskilled or semi-skilled labor. (R. 23, 45). However, considering Plaintiff's age, high school education, work experience, RFC, and the VE's testimony, the ALJ found that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (*Id.*). The ALJ concluded that Plaintiff is not disabled as defined by the Act, and therefore not entitled to a period of disability, DIB, or SSI. (R. 24).

## III.    Plaintiff's Arguments for Reversal

To say it has been a challenge to navigate Plaintiff's unorganized arguments would be an understatement. In the interest of carefully examining the merits of Plaintiff's claims, the court has scrutinized Plaintiff's arguments and found six specific allegations: (1) Dr. Storjohann's opinion should be granted "significant or controlling weight" because he is the examining psychologist, unlike Dr. Leonard who "has never seen, treated or examined" Plaintiff (Pl.'s Mem. 12); (2) Dr. Leonard's findings are improper because they place a "greater emphasis" on

the findings of some of Plaintiff's medical records above the findings of Dr. Storjohann's psychological evaluation (Pl.'s Mem. 10); (3) besides Dr. Storjohann's evaluation, "none of the other records quantify the negative impact of the claimant's emotional problems on her ability to work" (Pl.'s Mem. 11); (4) "the Northeast Alabama Regional Medical Center records of March 16, 2007 are dated prior to the alleged onset date of disability in this case" and were improperly used in Dr. Leonard's report (*Id.*); (5) Dr. Leonard "has not had access to all medical records considered by the ALJ in making the disability determination" which should invalidate his report (*Id.*); and (6) the ALJ did not allow the VE to testify to an allegedly relevant question from Plaintiff at the ALJ hearing  (Pl.'s Mem. 9-10).

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. § 405(g) mandates that the commissioner's findings are conclusive if supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence.  *See id.* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other

citations omitted).  If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings.  *See Martin*, 894 F.2d at 1259.  While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance."  *Lamb*, 847 F.2d at 701.

## V.   Discussion

### a.    The ALJ Improperly Discredited Dr. Storjohann's Medical Opinion

Plaintiff contends Dr. Storjohann's opinion should be granted "significant or controlling weight" because unlike Dr. Leonard, he is the examining psychologist, and Dr. Leonard "has never seen, treated or examined" Plaintiff.  (Pl.'s Mem. 12).  The court agrees that the ALJ erred in his treatment of Dr. Storjohann's medical opinion, though not for the precise reasons alleged by Plaintiff.

The Eleventh Circuit has long recognized that while the examining consultant's opinion is afforded more weight than a non-examining consultant's opinion, the ALJ has the discretion to "reject the opinion of *any* physician when the evidence supports a contrary conclusion."  *Syrock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (citing 20 C.F.R. § 404.1526) (emphasis added).  Whenever the ALJ chooses to discredit a medical opinion, he is required to "state with particularity the weight he gives to different medical opinions and the reasons why."  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

When developing Plaintiff's RFC, the ALJ relied upon the opinions of two psychologists: Dr. Dale Leonard, the state agency psychological consultant; and Dr. Robert Storjohann, the examining psychologist.  (R. 23).  Both psychologists examined Plaintiff once; Dr. Leonard on July 23, 2007 (R. 250), and before that, Dr. Storjohann on July 16, 2007 (R. 239).  Both

11

psychologists conducted RFC evaluations of Plaintiff.  Both evaluations are thorough and comprehensive and no evidence has been found in the record to impeach the credibility of either psychologist.  The two psychologists reached different findings regarding Plaintiff's limitations. Dr. Storjohann found Plaintiff to have "moderate to marked deficits in her ability to understand, carry out, and remember instructions" and "marked to extreme deficits in her ability to respond appropriately to supervision, coworkers, and work pressures in a work setting."   When evaluating Plaintiff's functional capacity in the same functional areas within a week of Dr. Storjohann's evaluation, Dr. Leonard found none of Plaintiff's abilities to be more than moderately limited.  (R. 264-65).

The ALJ states that he "relied on the opinion of the state agency psychological consultant [Dr. Leonard]," but "gave somewhat less weight to the opinion of the examining psychologist because it is somewhat restrictive given the claimant's lack of mental health treatment."  (R. 23) But when the conclusions of the examining psychologists differ to the extent that they do in the instant case, accepting the opinion of one psychologist over the other constitutes more than merely giving the latter opinion less weight; it is a tacit rejection of that opinion.  Whenever the ALJ chooses to discredit a medical opinion, he is required to "state with particularity the weight he gives to different medical opinions and the reasons why."  *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

In this case, the court concludes the ALJ provided improper reasons to discredit Dr. Storjohann's opinion, and this error sufficiently draws into question the ALJ's credibility determination to merit remand. The ALJ assigned less weight to Dr. Storjohann's conclusions "because it is somewhat too restrictive given the claimant's lack of mental health treatment." (R. 23).  In particular, the ALJ relied on the fact that because Plaintiff failed to seek mental health

treatment after December 2005, she is not "experiencing the severe psychiatric problems she alleges." (R. 22). The court concludes this finding is not supported by substantial evidence for the reasons stated below.

As already noted, an ALJ is free to discredit a physician's opinion "when the evidence supports a contrary conclusion." *Syrock*, 764 F.2d at 835 (11th Cir. 1985). However, when a physician's opinion is discredited due to a claimant's failure to seek medical treatment, this evidence can only be used to deny her benefits in certain circumstances. *See Lucas v. Sullivan*, 918 F.2d 1567, 1571 (11th Cir. 1990) (stating disability benefits may be denied when "1) the claimant failed to follow prescribed course of treatment, and 2) her ability to work would be restored if she had followed the treatment"); *McCall v. Bowen*, 846 F.2d 1317, 1319 (11th Cir. 1988) ("[T]he Secretary may deny SSI disability benefits only when a claimant, without good reason, fails to follow a prescribed course of treatment that could restore her ability to work."). However, failure to seek medical treatment is not dispositive in determining disability status, especially when the claimant is unable to afford the treatment. *Dawkins v. Bowens*, 848 F.2d 1211, 1213 (11th Cir. 1988) ("While a remediable or controllable medical condition is generally not disabling, when a claimant cannot afford the prescribed treatment and can find no way to obtain it, she is excused from noncompliance.").

Dr. Storjohann's evaluation of Plaintiff cannot be given "less weight" until further proof is provided to show: (1) Plaintiff was prescribed treatment; (2) she could afford the treatment; and (3) her failure to pursue treatment directly affected her ability to work. *See Lucas*, 918 F.2d at 1571; *McCall*, 846 F.2d at 1319; *Dawkins*, 848 F.2d at 1213. The parties do not dispute the ALJ's finding that Plaintiff suffers from severe mental impairments for which she has been taking extensive medication. (R. 17-19, 22). Nor is it disputed that Plaintiff was advised to seek

13

additional mental health treatment:  Dr. Ismail "recommends me to go to mental health" (R. 43);

advised to seek group therapy  (R. 228); "she is in need of intensive mental health treatment" (R.

239); advised to seek mental health treatment in a partial hospitalization program (R. 271).

These recommendations, standing alone, are insufficient without an inquiry into Plaintiff's

financial status.

The record reveals there was no inquiry made at the hearing into Plaintiff's financial

situation to determine if she could afford treatment.  (*See* R. 43).  Contrary to the ALJ's

reasoning, Plaintiff was not working up until the alleged onset date of her disability (R. 22);

rather, her last day of work is shown to be in July 2006.  (*See* R. 121-28, 200, 235).  In addition,

there are several instances where Plaintiff informally alludes to her challenging financial

situation.  (*See* R. 203 (reporting "[t]he patient is not taking her medication because of financial

issues" and "[t]he patient ran out of her Lopressor and Altace 1 month ago because of financial

reasons"); R. 238 ("problems with access to health care services"); R. 283 ("patient has

difficulty affording her medications and she has applied for disability").  *But see* R. 177 ("no

reckless spending"); R. 288 ("Do you have any financial needs related to food/medication/

equipment: NO")).  The court acknowledges that Plaintiff has received treatment for her physical

impairments and is taking extensive prescriptions, which seemingly requires money.  It is not

this court's place to assume facts into existence.  *See Moore v. Barnhart*, 405 F.3d 1208, 1211

(11th Cir. 2005) ("We will not reweigh the evidence, decide the facts anew, or make credibility

determinations.").  In the context of this case, Plaintiff's lack of mental health treatment was

improperly considered, and it should not be the basis for discrediting the examining consultant's

prognosis without sufficient proof to support such an inference.  Moreover, as Plaintiff's lack of

mental health treatment cannot be used to deny her disability benefits, it should not be the

exclusive basis for discrediting the examining consultant's prognosis when his conclusions would otherwise be given credible deference. *See Lucas*, 918 F.2d at 1571; *McCall*, 846 F.2d at 1319; *Dawkins*, 848 F.2d at 1213.

**VI.    Conclusion**

For the reasons stated above, the court concludes that the ALJ's determination that Plaintiff is not disabled is not supported by substantial evidence and proper legal standards were not applied in reaching this determination.  The Commissioner's final decision is, therefore, due to be remanded and a separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this _____26th_____ day of September, 2012.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE